Howry, J.,
delivered the opinion of the court:
These cases are of a class numbering more than 2,000 involving claims for men drafted into the military service of the United States in the spring of 1864. The amount claimed in the cases as represented by all classes of the demands now being prosecuted in this court makes a total of over $646,800.
*344 The claims are familiarly known as the Kentucky drafted cases. There are three classes: (1) Cases where a man was drafted and released from the obligation to render personal service upon payment of $300 commutation money; (2) cases where a man was drafted and was released upon furnishing a substitute on his own terms by private contract; (3) cases where a slave was drafted, but was released upon payment of $300, presumably by his master.
Refunds of commutation money estimated at'$300 in each case are asked of the United States. The findings are based upon the documentary evidence on file in the court from the War Department, some of which evidence appears in certain Senate reports. The final and suplemental report of the War Department filed December 3, 1910, has also been considered in connection with the original returns from the War Department in the case of J. W. Clements v. United States (Congressional, No. 11917-11), dated August 1, 1907, as supplemented in a communication of the War Department under date of July 28, 1909, embodied in Senate Document No. 142, Sixty-first Congress, first session, and report from said department in each individual case.
The findings are further based upon a supplemental report of the War Department filed December 3, 1910, which more fully explains the previous official reports and discloses more in detail the reasons why it was not practicable to defer the drafts under which 13 counties in Kentucky had to supply able-bodied men for the military service under those provisions of law in force previous to February 24, 1864. (Finding II.)
The evidence embodied in the final report of the War Department has been used by the court in making up the findings with the knowledge of counsel on both sides.
On March 14,1864, the President, by public proclamation, ordered a draft of 200,000 men, and the State of Kentucky was called upon to furnish its proportion of men for the military service. The authority of the call was neither disputed then nor can it be now. The number called from Kentucky was in proportion to the arms-bearing population of that State as compared with the other States.
*345 But by an act approved February 24, 1864, 13 Stats., 6, it was provided that the quotas of each ward of a city, town, township, precinct, or election district, or of any county where the county was not then divided into wards, towns, townships, precincts, or election districts, should be, as nearly as possible, in proportion to the number of men resident therein liable to render military service, “ talcing into account as far as practicable ” the number which had been previously furnished therefrom. The act provided that no person should forcibly resist or oppose the enrollment; that all able-bodied male colored persons between the ages of 20 and 45 years should be enrolled and form part of the national force, and that the slave of a loyal master, if drafted and mustered into the military service, should become free. Bounties were likewise provided in special cases.
The statutory provisions authorizing the draft were not merely directory but mandatory. Eegardless of who was drafted, without reference to a strict adherence to the quota to be supplied from the distinct localities named, the drafts in all the counties were not void drafts if the number of men did not exceed the number called for by the proclamation of the President.
It was not until March 1, 1864, that the adjutant general of Kentucky suggested a redistribution of the credits of that State, on the ground that due credit for men previously raised had not been given to the various communities of the State. The military authorities of the United States, who had oversight of the matter and who always kept a careful account of the men raised in the various districts and sub-districts (under the former law), investigated the' matter of credits allowed in Kentucky and, as a result of an investigation ending April 12, 1864, ordered a readjustment to be made of the credits of the subdistricts in Kentucky.
But the proper quotas were not ascertained or actually made until on or about July 21, 1864. The findings show there was no delay in the endeavor to obtain the necessary information. But meantime the draft proceeded, to meet the requirements of the proclamation for men. The number drafted from each county was determined by the assignment under the call, taking into consideration the credits to which *346 the various counties were entitled for men previously furnished. The military authorities had to be guided by the quotas and credits of each district and sub district as reported at the time the drafts were necessary to be made. Conditions varied considerably in the different counties of the State.
When 13 counties (including Pendleton County) were called upon to furnish their respective quotas under the call of March 14, 1864, it was found that the credits of those 13 counties as then recorded were insufficient. As a consequence, drafts were made in May, June, and early part of July, 1864, resulting in the draft of more men than under the act of February 24, 1864, supra, they would have supplied if another distribution of credits had been practicable and made the basis of action by the War Department. The redistribution of credits in these 13 counties was not completed until July 21,1864, and it was then found that these counties were entitled to a larger number of credits than under the former system. Had the power to carry out the order of April 12, 1864, directing a readjustment of the credits been practicable before the dates of the drafts under the proclamation of March 14, 1864, no drafts would have been made in May, June, or July, 1864, conflicting with the act adding to the number of said districts by making the subdivisions greater, as the counties affected would have supplied a lesser number of men than were really drafted for want of information and knowledge as to the number of men those counties should have supplied under the new law.
The findings show that there was nothing in the official records of the War Department to indicate that there was any unnecessary delay in the readjustment of credits in Kentucky, and that the military authorities had no means of knowing what was the true condition of quotas and credits when the drafts from the 13 counties mentioned were made.
By the law under which the War Department was enabled to act in obtaining recruits credits could only be given to the State and subdistricts. The findings show that it was impossible as to any change in the credits “ to adjust them *347 for the present draft.” Provost Marshal Gen. Kep., p. 6. That is, for the draft then in progress under which these claimants were drafted.
The unequal character of apportionments whereby some counties supplied more than other counties arose under the law as originally enacted because little attention had been paid to the localities from which volunteers came, in consequence of which there were no records either in the office of the adjutant general of Kentucky or in the War Department to show that some localities in the State furnished more men than other localities.
There was a necessity for the draft to proceed without awaiting the slow and tedious methods of obtaining data for a redistribution of credits according to wards, towns, townships, precincts, and election districts. An invading army, under the command of Gen. Morgan of the opposing army, about that time went into Kentucky from the east (interfering with the work of mustering in men in the fourth, fifth, sixth, seventh, eighth, and ninth Kentucky districts), and there were other raids into the State, as well as local uprisings of people, which affected a part of Kentucky so much that the work of apportionment under the new law was not only materially interfered with but rendered any progress with the count of men subject to military duty in Kentucky according to localities impossible, because of the presence of these hostile forces and domestic turmoil and excitement.
Had the authorities awaited the result of investigations of complaints serious delay would have ensued in obtaining troops sufficient to enroll the requisite number from the State of Kentucky. Hence the military authorities were compelled to base their acts with regard to the matter of quotas upon such records as were in hand' at the time the draft ordered March 14, 1864, was in active progress.
The findings show that in conscripting men for the service the military authorities always took into account “ as far as practicable ” the quotas and credits of each county, but were compelled to depend upon the available data according to the records at the seat of government in executing the work and making effective the common defense.
*348 Shortly after the passage of the act approved March 3, 1863, 12 Stats., 731, regulations were provided so that each congressional district was constituted one district. This first act definitely fixed the limits of each district from whence the men were to be gathered. In carrying out the first act the military authorities of the United States cooperated with the State authorities in arriving at any conclusion concerning drafts and the quotas to be gathered according to the population of the State and the subdistricts described in the act of March 3, 1863, 12 Stats., 731. For want of time the limits of such districts from whence the men were to be taken, as contemplated by the act of February 24, 1864, could not be diminished or so changed as to make the draft effective under the later act.
Congress never undertook to legislate in favor of these drafted men except according to the regulations and rules of the War Department. Congress did enact February 28, 1867, 14 Stat., 416, that the Secretary of War should refund to any person drafted who furnished a substitute or paid commutation money wherever it appeared that under the decisions and rules of the War Department governing at the time the said person was entitled to discharge from the obligation to render personal service under the draft for which he paid money or furnished a substitute, and to refund, in like manner, in all cases wherein it should appear that a person so having paid commutation money or furnished a substitute was not legally liable to draft. This provision applied only to claims received at the War Department prior to its passage.
Subsequently an amendatory act was passed March 1,1869, 15 Stat., 282, authorizing the filing of all claims under the act of 1867, ante, to be presented within,two years.
Under this amendment claims were presented to the Secretary of War, but were disallowed upon the ground that the redistribution of credits in the counties whence came the drafted men had not been completed until after the draft had been carried into effect. Upon a motion for a rehearing the Secretary of War, July 30, 1879, decided that inasmuch as no new evidence had been presented and no new *349 legislation bad intervened by which the rights of the claimant were advanced or modified, the Secretary could not properly review the previous decision in the absence of new facts or law. The only action taken by Congress on the recommendation of the Secretary of War was to refer many such cases to this court under the act approved March 3, 1883, commonly known as the Bowman Act, 22 Stat.-, 485. Meantime a test case had been brought in the name of John H. Marshall v. The United States by way of appeal to the Court of Claims from the decision of the Secretary of War, but was dismissed by this court for want of jurisdiction April 26,1886, 21 C. Cls. R., 307.
The claims now being considered are here for investigation under the act of March 3, 1887, 24 Stat., -505, commonly known as the Tucker Act. Our conclusions are under the act of June 25, 1910, 36 Stat., 837.
As by the terms of the law drafts under which the refunds are claimed were neither void nor voidable, these drafted men would have had no right to indemnity or compensation of any kind (except for such bounties as the Government had authorized to be paid and except for soldiers’ pay for services rendered) had they entered the service in person and duly served under the draft which required their personal service. If, when drafted, they bought their way out of personal danger, the obligation of the Government to refund the amounts paid by them could rise no higher than if the drafted men had kept their money and rendered military service at the risk of life and limb. The payment of the sums back to the men who procured substitutes or who paid $300 to the Government to provide substitutes would be such a concession on the part of the Government as necessarily to imply that the draft was illegal and that the men who did service as substitutes were unlawfully taken into the military service.
The refunds would in effect mean that the drafts were at least voidable, if not void, thereby contradicting the terms-of the law which said they were neither.
It needs no argument to prove the legality of the drafts, because the statute establishes that much. The insertion of *350 the provision in the statute directing the men to be con scripted without reference to future conditions shows clearh the intent of Congress. None of the drafted men from any part of Kentucky could under the terms of the statute have obtained his liberty by writ of habeas corpus had such drafted men undertaken to show that the draft from any one county was illegal. The personal service of sucii drafted men as were conscripted was the Government’s right. If the men preferred to provide substitutes and the Government extended to them that privilege, there is no ground left for argument that either a legal or an equitable claim arose.
If a master perferred to prevent his slave from becoming free when the draft operated upon slave property then in the master’s possession, the Government in a case like that could not have been called upon to refund anything unless we admit that the Government could be deprived of the means of defense where the wish of the able-bodied population was superior to the necessities as well as the power and lawful authority of the Government.
When we supplement to the terms of the law under which the drafts were made the findings of the court that it was not practicable to equalize the conscription except by districts until after the men were drafted we have a state of facts which completely meets the situation as to the nature of the legal and equitable conclusions. The facts as well as the law preclude any conclusions other than that the claims are neither legal nor equitable.
The court’s careful statement of the conclusions which are authorized by the act of June 25, 1910, 36 Stats., 837, is of moment because of the importance not only to the Government but to the people of the whole country with respect to the principles involved.
From the time governments were instituted among men the arms-bearing populations have had to meet the call of the nations in stress of war. The duty to respond rises above personal conveniences or matters of mere money or business.
*351 All history shows that conscripts have generally obeyed orders and made good soldiers according to the measure of obedience to military discipline. But this affords no reason why drafted men should be given more consideration than volunteers or why those willing to pay to avoid a draft should have the money used by them to secure exemption from the service refunded. The bounties provided for volunteers were not as much as the bounties whieh substitutes obtained by reason of the permission of the' Government to men drafted for personal service to pay for these substitutes.
Once the principle be adopted that troops can not be raised by conscription without permitting the conscripts to pay their way out at a price not fixed by the Government or fixed higher in emergencies than original bounties, the system of voluntary enlistment would be much discouraged.
Eminent authorities hold that substitution for military service was originally permitted as a privilege to individuals and not for any benefit a government could derive from it. Being an act of grace and favor on the part of the Government and not a matter of contract which would preclude a government from again drafting the principal if his services were actually needed, the court is of opinion that the claims for a refund of the amounts paid to the substitutes are not claims, legal or equitable, against the United States.
The drafted men having received a consideration satisfactory to each of them in the privilege accorded to each to be exempt from military service, and their draft into the military service having been legal as well as necessary under conditions as they existed at the time of the drafts, there is no apparent reason why they should now complain because of the action of the Government in refusing to recognize their claims to have the amounts paid by them for substitutes refunded.
The conclusion of the court upon the whole case is that the claims of the respective claimants are not founded upon any obligation of the Government, legal or equitable; that the payments made by the respective claimants as set forth *352 in the findings were made at their own requests and for their own benefit, and that the Government, by accepting the money in lien of the military service of the claimants, assumed no responsibility and incurred no liability.
The cases will be reported to the Senate, together with a copy of the findings and this opinion.